**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KEITH SNYDER and SUSAN MANSANAREZ, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 14 C 8461** |
| **OCWEN LOAN SERVICING, LLC,** | ) ) | |
| **Defendant.** | ) | |
| -------------------------------------------------- | ) | **consolidated with** |
| | ) | |
| **TRACEE A. BEECROFT,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 16 C 8677** |
| **OCWEN LOAN SERVICING, LLC,** | ) ) | |
| **Defendant.** | ) | |

**ORDER ON MOTION FOR FINAL APPROVAL
OF FIRST AMENDMENT TO CLASS ACTION SETTLEMENT**

The plaintiffs in these consolidated cases filed suit against Ocwen Loan

Servicing, LLC on behalf of a putative class, alleging, among other things, violations of

the Telephone Consumer Protection Act (TCPA) and the Fair Debt Collection Practices

Act (FDCPA). The parties reached a classwide settlement and moved for the Court to

approve it. After thoroughly reviewing the settlement, the Court declined to approve it.

The parties returned to negotiations and modified the proposed settlement to address

the Court's concerns. The plaintiffs now move for final approval of the first amendment

to the settlement and for attorneys' fees. The Court grants the motion for final approval of the settlement, with modifications described in this decision. The Court also grants the plaintiffs' motion for attorneys' fees in part.

## Background

### A.      Procedural history

In October 2014, the plaintiffs in these consolidated cases filed suit against Ocwen. They challenged Ocwen's alleged practice of making debt-collection calls using an automated telephone dialing system without the call recipients' prior consent. In late December 2016, the plaintiffs separately sued a number of banks that served as the trustees for loans to the putative class members, alleging that the debt-collection calls were made on the banks' behalf, making them also liable for the resulting violations. *Snyder v. US Bank, N.A.*, No. 16 C 11675 (N.D. Ill). The class was potentially enormous. As of December 2016, Ocwen was servicing 1.4 million mortgage loans. Plaintiffs represented that Ocwen's records showed that it had made, during the period covered by the limited class proposed for preliminary injunctive relief, over 146 million calls to 1.45 million unique telephone numbers. And, indeed, Ocwen ultimately produced a list of nearly 1.7 million unique telephone numbers that its records indicated had been dialed.

In late June 2017, the Court provisionally granted, in the Ocwen suit, the plaintiffs' motion for certification of a limited class under Federal Rule of Civil Procedure 23(b)(2) and for a preliminary injunction to prevent Ocwen from continuing certain practices that allegedly violated the TCPA. *See Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893 (N.D. Ill. 2017). Before the Court's ruling on the motion for a

preliminary injunction, the parties conducted extensive discovery, including exchanging information regarding calls made by Ocwen and information regarding the basis for Ocwen's defense that it had acted with the consent of the call recipients. Plaintiffs encountered significant hurdles in obtaining information supporting Ocwen's consent defense, largely because of the way in which Ocwen kept its records of debt collection calls. This same problem, however, complicated Ocwen's ability to prove the defense.

Meanwhile, several rounds of settlement negotiations occurred. A mediation in May 2016 with retired Judge James Holderman was unsuccessful. At a second mediation, this one facilitated by mediator Rodney Max in October 2016, Ocwen disclosed that its insurer had denied coverage for the claims asserted by the plaintiffs and suggested that it had a limited ability to finance the settlement on its own. These revelations led to the second mediation's unsuccessful termination. The same considerations also led the plaintiffs to move to amend their complaint in the *Snyder* case to add as defendants the banks that were trustees of the loans on which Ocwen had attempted to collect. The Court denied the motion as untimely. The plaintiffs then filed a separate suit against the banks, which the Court found to be related to *Snyder* under Local Rule 40.4, resulting in the transfer of the newly filed case to the undersigned judge's docket.

In July 2017, shortly after the Court granted the motion for a preliminary injunction, a third mediation was held with retired U.S. Magistrate Judge Morton Denlow. This mediation resulted in an agreement to settle the claims of the putative class. It is reasonable to conclude that the settlement was produced, at least in part, by the plaintiffs' successful prosecution of the motion for preliminary injunction and

certification of a limited class, and by their filing of the lawsuit against the bank defendants—who, the Court later learned, had tendered the defense of the case to Ocwen based upon apparent contractual indemnification provisions.

## B. Original settlement

The original settlement agreement provided for the establishment of a fund of $17,500,000. This would have been used to pay, first, costs of notice and administration—requested at $1,600,000; second, attorneys' fees—requested at one-third of the total settlement less administration costs, or $5,289,250; third, incentive awards for the three named plaintiffs, requested at a total of $75,000; and, finally, payment of the claims of class members who submitted claim forms. Given the number of class members who submitted claim forms (see below), had the Court approved the costs, fees, and incentive awards in the amounts requested, each class member who submitted a form would have received about $39. The first proposed settlement also included injunctive relief requiring Ocwen to change its practices for obtaining consent to call borrowers, including a requirement to pay enhanced damages to those who inappropriately receive automated calls in the future. *See* Final Settlement Agr., dkt. no. 252-1, ¶ 4.2. Finally, the settlement provided for dismissal of not only the *Snyder* and *Beecroft* suits against Ocwen, but also the putative class's suit against the banks. *See id.* ¶ 3.5. The banks offered no contribution to the settlement fund or any other consideration for the dismissal of the case against them.

The Court preliminarily approved the proposed settlement, including conditional certification of a settlement class, in October 2017. Notice of the proposed settlement was then sent to the members of the class, giving them the opportunity to make claims,

object, or request exclusion (also called "opting out").  The settlement class consisted of persons who had been called on nearly 1,700,000 cellular telephone numbers.

In March 2017, the plaintiffs moved for final approval of the proposed settlement, for incentive awards for the named plaintiffs, and for payment of administrative fees and an award of attorneys' fees from the settlement proceeds.  The motion was fully briefed by the end of April.  In September 2018, the Court denied the motion for final approval because it was concerned that the agreement (1) potentially overcompensated class counsel; (2) failed to address Ocwen's ability (or inability) to pay, which was relevant to the Court's assessment of the reasonableness of the settlement amount; and (3) would release the claims against the bank defendants for nothing.  *See Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2018 WL 4659274, at *5-6 (N.D. Ill. Sept. 28, 2018). The Court deferred decision on whether late claims and opt-outs would be accepted. *Id.* at *6.

## C.    Subsequent negotiations and the amended settlement

Following the Court's denial of the motion to approve the final settlement agreement, the parties returned to mediation.  A fourth mediation session—the second with retired Judge Denlow—occurred on July 20, 2017 and resulted in an improved settlement.  A number of the settlement's terms were unchanged from the original proposal.  For instance, the settlement still provides for $1,600,000 in administration and notice costs and requests $75,000 (to be split three ways) in incentive payments for the named plaintiffs.  Likewise, class counsel still requests a total of $96,380 in costs— $29,600 to be paid to Mark Ankcorn (reduced from his original request for $35,000) and the remaining $66,780 to be divided among the other firms that shared in representing

the plaintiffs.

But the proposed amended settlement also makes several significant changes. Most significantly, the settlement fund provided for in the agreement has increased by $4,000,000 from $17,500,000 to $21,500,000. Moreover, class counsel seeks $500,000 less in attorneys' fees, bringing that figure down from $5,289,250 in the original settlement to $4,789,250 in the amended settlement. Next, the amended settlement also provides for dismissal of only the *Snyder* and *Beecroft* suits against Ocwen and does not seek to release the claims against the bank defendants. Finally, the proposed amendment adds to the injunctive relief described in the original settlement.[1]

The upshot, then, is that the proposed amendment provides at least $4,500,000 more for payment of the claims of class members who submitted claim forms and leaves the class free to pursue claims against the bank defendants if it chooses. Given the number of class members who submitted claim forms, if the Court approves the costs, fees, and incentive awards in the amounts requested, each claim will be worth between $53 and $74, depending on the Court's handling of disputed claim submissions and opt-outs. Even the lower end of this range compares quite favorably to the approximately $39 recovery each claimant would have received under the original settlement.

---

[1] The parties report that Ocwen has already implemented the changes required by the original proposed injunction. *See* Pls.' Br. in Supp. of Mot. for Approval of First Am. to Settlement Agreement & Release, dkt. no. 350, at 4. The amended settlement goes further and sets out specific requirements for how the injunction is to be maintained by Ocwen during and after its adoption of new loan servicing technology. *See* First Am. to Settlement Agreement & Release, Ex. 1 to Terrell Decl., dkt. no. 353, ¶¶ 4-5.

The plaintiffs have moved for final approval of the amended settlement agreement.

## C.  Imperfect claims and opt-outs

The deadline to file claims and opt-outs was March 5, 2018.  The administrator reports that it received 212,165 complete and valid claim forms as well as 5,401 forms that were missing signatures, which the claimants were provided an opportunity to cure.[2]  The settlement allows individuals to submit separate claims for up to three phone numbers, but 5,318 claimants erroneously submitted two phone numbers on a single claim form and another 59 claimants submitted three numbers on a single form.  The administrator also received 52,709 claims that included numbers that did not match phone numbers from the list provided by Ocwen, 23,212 duplicate claims, and 124 requests to withdraw claims.  Additionally, there were a total of 3,801 late claims submitted, discussed further below, including 358 filed by an individual named Reuben Metcalfe.

| Description | Count |
|---|---|
| Complete claims | 212,165 |
| Incomplete claims (missing signature) | 5,401 |
| Multiple number claims | 5,436 |
| Late claims | 3,801 |
| Claims for numbers not on list | 52,709 |
| **Total** | **279,512** |

As for opt-outs, the administrator reports having received 379 timely and complete requests, 178 late requests, and eighteen incomplete requests.  Almost all of

---

[2] Numbers are drawn from the supplemental declaration of Michael R. O'Connor, the vice president of class administrator Epiq Class Actions & Claim Solutions, Inc.  *See* dkt. no. 354.

the late claims were either (1) postmarked and received by the administrator within the two weeks following the March 5 deadline or (2) submitted in April 2018 by Reuben Metcalfe.  As the Court discovered at the April 5, 2018 hearing, Metcalfe is the proprietor of a then-nascent business specializing in assisting class members in consumer class actions exercise their rights to submit claims or opt-out of such litigation.  At that hearing he admitted that the late-submitted claims and opt-outs were a product of his own mistake rather than the neglect of any member of the plaintiff class.

**D      Mark Ankcorn's role**

Finally, the conduct of one of the attorneys who represented the plaintiff class bears on the resolution of these motions.  Mark Ankcorn agreed to prosecute this case jointly with counsel from four other firms on behalf of the class.  Ankcorn's service was, by all accounts, satisfactory for much of the case's history; indeed, his firm served as lead counsel for the class for much of the litigation.  But in November 2017 Ocwen filed a motion informing the Court that Ankcorn had potentially (1) committed an ethical violation by encouraging high-value members of the class to opt out and pursue their claims individually and (2) violated this Court's protective order regarding confidential information produced by the defendant.  *See* dkt. no. 268.  These allegations and the ensuing related proceedings bear, to some extent, on the final resolution of this matter. But because it is difficult to understand why the details matter without context, the Court reserves their discussion until later in this opinion.

**Discussion**

**A.      Amended settlement approval**

A district court may approve a proposed settlement of a class action only after it

directs notice in a reasonable manner to all class members who would be bound and

finds, after a hearing, that the proposed settlement is "fair, reasonable and adequate."

Fed. R. Civ. P. 23(e)(2).  In making the latter determination, courts in this circuit

consider the following factors:

> (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) the stage of the proceedings and the amount of discovery completed. . . .  The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863–64 (7th Cir. 2014) (internal quotation

marks and citations omitted).  Rule 23(e)(2) also sets forth a list of points a court must

consider in determining whether a proposed class action settlement is fair, reasonable,

and adequate.  The Court will address these points as well.  They include whether:

- the class representatives and class counsel have adequately represented the class;

- the proposal was negotiated at arm's length;

- it treats class members equitably relative to each other; and

- the relief provided by the settlement is adequate, taking into consideration the costs, risks, and delay of trial and appeal; the effectiveness of the proposed method of distributing relief; the terms of any proposed award of attorneys' fees; any agreements made in connection with the proposed settlement.

Fed. R. Civ. P. 23(e)(2).

### 1.   Fairness, reasonableness, and adequacy of the proposed settlement

Significant portions of the Court's analysis remain materially unchanged from the

previous order.  Nevertheless, the Court will once again carefully review each of the factors set forth in *Wong* and Rule 23(e)(2).

### a. Adequacy of representation of the class

The named plaintiffs participated in the case diligently, including being subjected to discovery.  And class counsel fought hard throughout the litigation and pursued mediation when it appeared to be an advisable and feasible alternative.  The Court has concerns regarding certain aspects of the conduct of Mark Ankcorn, which are discussed below.  But there is no basis to believe that Ankcorn's conduct influenced the representation of the class by counsel unaffiliated with his law firm.  Nor does the Court believe that misconduct attributed to Ankcorn—who was only one of several attorneys who represented the class—is on its own problematic enough to seriously undermine the proposed settlement's viability under this factor.

### b. Arm's length negotiation

The record reflects that the settlement was negotiated at arm's length.  The parties conducted their negotiations via three separate and independent mediators— retired Judge James Holderman, mediator Rodney Max, and retired Magistrate Judge Morton Denlow.  There is no indication of any side deals material to this analysis.[3]  And there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's length negotiation.

### c. Treatment of class members vis-à-vis each other

The proposed settlement treats all class members the same; each is entitled to a

---

[3] The Court includes this limitation in light of the later discussion of Mark Ankcorn.

single payment for each claim submitted. There is an argument to be made that this is inequitable, as some class members received more unwanted calls than others— including some who received hundreds or even thousands of unwanted calls. No class member has objected on this basis, however, and the ability to opt out (plus an explanation in the class notice of what a class member who opts out might expect) has provided a safety valve that permitted class members on the higher end of the call spectrum to, in effect, vote with their feet and pursue the possibility of a greater award. The Court is especially comfortable with the effectiveness of the opt-out mechanism to cure any potential inequity among class members in light of the Court's treatment of modestly late opt-out requests, discussed below. The Court finds that the proposal for equal treatment is reasonably equitable.

### d. Adequacy of relief

The six factors identified by the Seventh Circuit in *Wong*, 773 F.3d at 863-64, and numerous other cases subsume most of the factors listed in Rule 23(e)(2). The Court addresses each in turn.

Complexity, length, and expense of further litigation. Little has changed regarding this factor since the Court's previous order. Almost all of the work that has occurred since then has been aimed at reaching a settlement that addressed the Court's concerns. As the Court previously observed, absent a settlement, a good deal of work would remain to bring the case to a conclusion. Fact discovery on the suit against Ocwen was largely completed before the parties reached the original settlement. But expert disclosure and discovery remained to be done. Plaintiffs had moved to certify a class under Rule 23(b)(3), and the remaining briefing on that motion

had yet to be finished. The losing party on that motion could then request an interlocutory appeal. Before this Court, both sides likely would have moved for summary judgment following determination of the class certification motion. It is fair to say that settlement obviated a significant amount of work in the suit against Ocwen.

One piece of the analysis has changed since the original settlement proposal, however. The Court previously noted that very little discovery had been done regarding the claims against the bank defendants at the time of the first settlement. But because the amended settlement no longer concerns the bank defendants, the complexity, length, and expense of litigating the claims against them is no longer a relevant consideration in this analysis. Nonetheless, the fact that the proposed settlement does not implicate the bank defendants does not meaningfully undermine the conclusion that approving the settlement would avoid substantial future litigation.

In sum, this factor favors approval of the settlement.

Amount of opposition to the settlement. There remain only three objections out of more than 270,000 responses submitted. This factor favors approval.

Opinion of competent counsel. Class counsel are experienced members of the plaintiff's consumer class action bar. They favor the settlement, and this is a factor supporting approval of the amended settlement. *See Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996). As the Court previously noted, however, they are hardly disinterested parties; they stand to gain handsomely—though materially less than in the original proposed settlement—if the Court approves the proposed fee award.

Stage of proceedings and amount of discovery completed. The analysis of this factor remains largely unchanged from the previous order. Though a lot of work

remains to be done if the case is not settled, much has been done already. Work previously completed includes a significant amount of fact discovery as well as litigation of the motion for preliminary injunction. And plaintiffs had, in the Court's view, sufficient information via discovery and otherwise to enable them to evaluate the merits of the case against Ocwen. *See Isby*, 75 F.3d at 1200.

One factor has changed considerably from the Court's previous analysis. In the last order, the Court noted that it had insufficient information from which to evaluate Ocwen's contention that its ability to pay was limited. Certainly the plaintiffs had enough information to determine that Ocwen could not write a check in the billion-dollar range— which may have theoretically been the judgment if Ocwen were ordered to pay full statutory damages for each alleged violation—and Ocwen's counsel repeatedly represented that the company was in a relatively tenuous financial position at least in light of the potential exposure. But, as the Court noted in its previous order, there was little information in the record regarding Ocwen's financial status when class counsel agreed to the proposed settlement at the third mediation.

Based on the parties' representations, the Court is now satisfied that Ocwen's financial status was not a significant factor in this settlement agreement and thus should not be a significant factor in deciding whether to approve it. Specifically, in their briefing on this motion for final approval, the parties assured the Court that Ocwen's ability to pay the judgment was not so limited that it influenced the settlement amount. They explained that any previous indication to the contrary was mistaken or uninformed and that such representations should be disregarded. The Court is persuaded that the parties are sufficiently apprised of the underlying facts to support those assertions.

The Court also previously noted that the parties failed to meaningfully discuss the claims against the banks in their papers on the previous motion for final approval. Because the claims against the banks have been removed from the proposed amended settlement agreement, that concern is no longer operative.

On balance, this factor favors approval of the amended settlement.

<u>Strength of the case compared with the settlement offer</u>.  The primary consideration in deciding whether to approve a proposed settlement under *Wong* and Seventh Circuit precedent is "the strength of the plaintiff's case on the merits balanced against the amount offered in settlement."  *Wong*, 773 F.3d at 864.  In addressing the original proposed settlement, the Court considered (1) the relative strength of the plaintiffs' claims and counsel's assessment of the merits, together with the risk to the claims of a potential adverse decision by the D.C. Circuit on a key legal issue; (2) the overall weakness of Ocwen's consent defense in light of its poor recordkeeping, but the potential for the defense to adversely affect class certification; (3) the lack of documentation supporting Ocwen's purportedly weak financial health, which had been offered as a basis to approve the settlement; (4) the entirely gratuitous dismissal of the claims against the bank defendants; and (5) what the Court considered a potentially unreasonably large request for attorneys' fees.  Balancing these considerations, the Court denied the motion to approve the original settlement.

The first two considerations remain unchanged.  For instance, although the parties present arguments about the relative strengths and weaknesses of the plaintiffs' claims in light of recent changes to the relevant regulatory regime, *see, e.g.*, *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), they largely reproduce points already made and

acknowledged in relation to the original settlement. The Court's assessment of the merits has not changed much since the order on the first motion for final approval.

But the amended settlement agreement includes several substantial changes that address the concerns outlined in the Court's previous order. First, as discussed above, the parties have provided assurances that Ocwen's finances are not relevant to the settlement. Specifically, they have represented to the Court that their own previous statements about Ocwen's financial infirmity were mistaken, overblown, or misinterpreted. Rather, they intended only to suggest that Ocwen would be unable to afford the multi-billion dollar judgment that would have resulted from class certification combined with a victory on the merits. In its papers on the motion for final approval of the amended settlement, for instance, Ocwen states that:

> It is not disputed that Ocwen cannot pay the many billions of dollars in damages that Plaintiffs are seeking. But the question of whether Ocwen might pay such a judgment is distinct from the question of whether Ocwen might be able to pay more than the agreed-on amount of the settlement. The proposed amended settlement is not predicated on Ocwen's ability or inability to pay more by way of settlement, and, as a result, Ocwen's financial capacity is not pertinent to whether the settlement is fair, reasonable and adequate.

Def.'s Br. in Supp. of Mot. to Approve First Am. to Settlement Agreement, dkt. no. 355, at 12-13. The Court is satisfied with the parties' assurances and concludes that their failure to provide details regarding Ocwen's finances is immaterial to the settlement analysis.

The parties have also addressed the Court's reservations regarding the bank defendants. Recall that the bank defendants were the trustees of the loans upon which Ocwen was seeking to collect when it allegedly violated the TCPA. After an attempt to add them to this suit was denied, the plaintiffs sued the banks separately and the Court

found that case related to this one. The original settlement agreement sought to release the claims against the banks for nothing and with no explanation. The amended settlement addresses this issue. Specifically, the plaintiffs, Ocwen, and the banks agreed during the fourth mediation that the amended settlement would not release the claims against the banks. In short, the banks have been carved out of the settlement, and the lawsuit against them is proceeding ahead. This change resolves the Court's concerns about the settlement's treatment of the bank defendants.

The other consideration that led the Court to deny the original settlement was the fee requested by class counsel. Specifically, the attorneys representing the plaintiff class sought nearly $5.3 million in attorneys' fees out of the $17,500,000 settlement fund. In tandem with other considerations discussed here, the Court concluded that such a fee was probably excessive. Class counsel wisely changed course. In the amended settlement, they seek $500,000 less in fees, or $4,789,250 in total.

Finally, one other key factor supports approval: the settlement got considerably larger. Between the original settlement and the amended settlement, the total amount of the settlement fund increased from $17,500,000 to $21,500,000. In combination with the reduced fee request from class counsel, that means that there is effectively $4.5 million more available to compensate individual claimants. As a result, claimants will be able to collect between $53 and $74 per claim—pending the discussion of late claims, opt-outs, and other loose ends below—up from the approximately $39 per claim to which they would have been entitled under the original settlement. This is a considerable improvement in the value of the settlement in both absolute and relative terms.

16

Taking these considerations together, the Court concludes that the single most important consideration under *Wong*, the strength of the case compared with the settlement offer, now favors approval of the amended settlement.

### e. Approval decision

The Court concludes that the amended settlement is "fair, reasonable and adequate," Fed. R. Civ. P. 23(e)(2), subject to the following modifications.

First, the attorneys' fee request is acceptable as to all attorneys other than Mark Ankcorn. Ankcorn's fees are to be modified as discussed below. "[D]istrict courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832 (7th Cir. 2018). Applying this standard, the proposed attorneys' fees are acceptable under either either the percentage or lodestar methods of analysis. *See Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014). The amended settlement requests around 22% of the total, less administration costs, as attorneys' fees, well within the parameters of the declining marginal fee scale often employed in this district. *See, e.g.*, *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 805-07 (N.D. Ill. 2015). Likewise, applying a lodestar cross-check reveals that the risk multiplier sought by plaintiffs' counsel is well within reason, *see, e.g.*, *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *17-21 (N.D. Ill. Dec. 9, 2009), with the key exception of Mark Ankcorn, whose fees are discussed below.

Second, the Court concludes that the amended settlement's proposal to give each of the three named plaintiffs $25,000 incentive rewards is excessive. Although

"[i]ncentive awards are justified when necessary to induce individuals to become named representatives," *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001), the proposed awards are disproportionate and unwarranted. In deciding the appropriate incentive award, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Most often, "[c]ourts in this District have granted $5,000 incentive awards to named plaintiffs in TCPA cases." *Douglas v. W. Union Co.*, 328 F.R.D. 204, 219 (N.D. Ill. 2018) (collecting cases).

In acknowledgment that the named plaintiffs here have endured several years of discovery, scrutiny, and inconvenience in the pursuit of the case, the Court approves incentives awards of $10,000 to each of the named plaintiffs, for a cumulative total of $30,000.

## 2. Adequacy of notice

As noted previously, the Court may approve a settlement only if it is satisfied that notice of the settlement has been effected in a reasonable manner. In this case, notice was sent by mail and/or e-mail to over 1.4 million class members, using addresses in Ocwen's records. No better sources for physical or e-mail addresses were reasonably available. The settlement administrator determined that 95 percent of the proposed settlement class received mail or e-mail notice, and this determination appears to be reasonably supported. There was an initial coding error, made by the administrator, in the Internet-based claim submission process, but this was fixed, and the deadline to file a claim was extended accordingly. The administrator also set up a toll-free number and

a website for class members to obtain additional information, and these were used extensively. The claim rate in this case was about 16 percent, which is far higher than the usual TCPA settlement—a further indication of the success of the notice program. As such, the Court reaffirms its finding that notice was sent in a reasonable manner to all class members and that, indeed, class members received the best notice practicable.

But the analysis does not end there. Because the amended settlement changes somewhat the terms upon which the plaintiff class's claims will be discharged, the Court must assess whether those changes are "material" and thus require a new round of notice to the class and a new Rule 23(e) hearing. *See Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018). The Seventh Circuit recently explained that any change that results in a disadvantage to the class without an offsetting benefit demands that a new round of notice be disseminated to the class. *Id.* But courts routinely hold that no new notice is required where changes to a proposed settlement are objectively favorable for class members and do not prejudice any benefit previously promised. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) (collecting cases).

The proposed amended settlement at issue here leaves class members objectively better off than the original settlement would have. Most directly, it substantially increases the payout per claim to which members are entitled. Moreover, it excludes the claims against the banks from settlement, meaning that litigation against them may yet be viable. These changes unequivocally enhance the value of the settlement to class members and they come at no apparent cost in terms of benefits provided by the original settlement. Because the changes embodied by the amended

settlement are entirely beneficial to the plaintiff class and have no apparent costs to it, the Court concludes that no further notice is required under Rule 23.

### 3. Objections

As noted above, the Court received three objections. They were from class members Brenda Stuart, Paul Squicciarini, and Daniel Seltzer. Each stated that his or her opposition stemmed from a combination of the relatively low per-claim award amount to which class members would have been entitled irrespective how many calls they received—then around $39—and the relatively high attorneys' fees sought in the original settlement—then $5,289,250, which was a third of the total settlement fund.

The Court overrules these objections. First, the per-claim award has improved considerably since the original notice. Furthermore, after reviewing the parties' submissions, the Court is satisfied that the per-claim settlement amount provided by the amended settlement falls comfortably within the range of rates that have been approved in the Seventh Circuit and elsewhere in similar TCPA litigation. And, in any event, objectors' reservations about the amount of the settlement could have been resolved by simply opting out of the class and filing separate suits.

Second, as noted previously, the attorneys' fees requested in the amended settlement are significantly lower than those sought in the original settlement, both in absolute terms and as a proportion of the total settlement fund. Two of the three objectors pointed out that the fee request in the original settlement sought one third of the total settlement fund. Because the fund has increased by $4,000,000 and the fee request has decreased by $500,000, the fee request now totals only a little more than 22% of the settlement fund. And, indeed, the total fee award will be less once the

adjustment discussed below is made by plaintiffs' counsel.

### 4. Late, incomplete, imperfect, and unlisted claims and opt-outs

The Court must also determine how to handle claims and opt-outs that were submitted late, were incomplete, included multiple phone numbers, or were submitted with phone numbers that did not appear on the list the defined the class. The Court has discretion to permit claims and opt-outs submitted after the March 5, 2018 deadline upon a determination that their tardiness was a product of excusable neglect. *See In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209-10 (D.C. Cir. 2003).

### a. Claims

The administrator received a total of 279,512 claim submissions (not including duplicates). Some 52,709 of these claims sought recovery for calls to phone numbers that did not appear on the list provided by Ocwen. Because the class notice clearly instructed claimants on how to submit claims and because settlement class was defined to include only "persons who were called by Ocwen on the 1,685,757 unique phone numbers" on the list it provided, *see* Order Conditionally Certifying Settlement Class, dkt. no. 266, at 3, the Court finds that these claimants fall outside of the plaintiff class and are entitled to no further opportunity to correct their submissions.

Another 5,401 claim forms bore phone numbers that matched the list but were missing the claimants' signatures. The class administrator provided these claimants opportunity to cure their submissions. The deadline to cure was February 14, 2019. Claimants who cured their submissions by that date are entitled to recovery; those who failed to cure their submissions are not.

The administrator reported that an additional 5,436 claims incorrectly listed

multiple phone numbers from Ocwen's list on a single form. The settlement agreement permits a single claimant to submit up to three claims for calls to three separate phone numbers but required submitting such claims on separate forms. Nevertheless, the Court finds that any neglect on the claimants' part was excusable and concludes that claim forms bearing two or three phone numbers on Ocwen's list should be treated as separate claim forms for the purposes of recovery.

Finally, 3,801 claims were submitted late, including 358 that were submitted by Reuben Metcalfe. These claims make up a tiny portion of the overall total—less than two percent of the nearly 280,000 total claims submitted to the administrator. As such, allowing them to go forward would have a negligible impact on class as a whole and no impact on Ocwen, which is on the hook for the same amount irrespective how many claims are filed. In light of these considerations, the Court finds the 3,801 late claimants' neglect to be excusable. And, as discussed further below, any neglect on the part of the claimants on whose behalf Metcalfe submitted claims is also entirely excusable because it was apparently his error, not the claimants', that led to the late submission. The late claims discussed here may therefore proceed forward as though submitted timely.

### b.    Opt-outs

Although the Court retains considerable discretion to allow late and otherwise imperfect opt-outs to go forward, the calculus is a bit different because opt-outs present a potential cost to the defendant. Specifically, any member of the class who exercised her right to opt out will not be bound by the terms of the settlement and may pursue individual litigation against Ocwen. Ocwen made clear at a hearing that it opposes

recognizing any of the late or incomplete opt-outs.  In this case, there were a total of 379 timely and complete requests to opt out of the plaintiff class.  Additionally, there were eighteen incomplete requests and 178 late requests.

At the threshold, the Court finds that the incomplete requests to opt-out are forfeited.  The class notice stated clearly how to opt out of the plaintiff class and a failure to do so correctly or to cure an incorrect opt-out by now—more than a year after the deadline—constitutes inexcusable neglect in light of the prejudice it would cause the defendant.

The late requests present a closer question.  The Court notes that nearly all of the late opt-outs were submitted either within two weeks of the March 5 deadline or in April 2018 by Reuben Metcalfe.  After considering the balance of the equities, the Court concludes that both groups will be allowed to opt out.  Most of the opt-outs in the first group were postmarked either the same week as the March 5 deadline or the following week.  Although these submissions fell outside the March 5 timeline, they were submitted near enough to it to make any neglect in their submission excusable.

The second group, the eighty-eight opt-outs submitted by Metcalfe, were postmarked on April 16.  Although longer after the deadline, the Court is still persuaded that these requests should be honored.  It was Metcalfe's error, not the fault of any of the class members requesting to opt-out, that led to their untimely submission.  That alone satisfies the Court that any neglect on the part of those seeking to opt out was entirely excusable.  That said, the Court recommends that Metcalfe take greater care in the future to observe the deadlines set by courts.

But not quite all of the opt-outs fall into the categories described above.  After

cross-referencing the class administrator's records with those provided by Metcalfe, it appears that three opt-out requests were submitted significantly beyond the deadline without any explanation. These three requests were from James Sweeny (postmarked March 26), Charles Calia (postmarked April 18), and Brian Lametto (postmarked June 14). The Court concludes that Sweeny's March 26 opt-out—precisely three weeks after the deadline—represents the outer limit of excusable neglect. That is, it will be honored, but none beyond it will be. For that reason, Calia's and Lametto's opt-outs— submitted forty-seven and 101 days after the deadline respectively—are deemed untimely and will not be authorized.

### 4. Summary

The Court concludes that the proposed settlement is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). The Court overrules the three objections made by members of the plaintiff class and further concludes that no additional notice is necessary for approval of the amended settlement. Finally, the Court finds that certain late and otherwise imperfect claims and opt-outs are authorized to proceed as described above.

## B. Ankcorn's actions and their consequences

In the background of this discussion looms Mark Ankcorn's ill-advised conduct in the months preceding the first proposed settlement. Ankcorn agreed to prosecute this case jointly with counsel from four other firms on behalf of the plaintiff class. Ankcorn's firm served as lead class counsel for most of the history of the case. But in November 2017 Ocwen filed a motion alleging that Ankcorn had potentially committed an ethical violation by encouraging high-value members of the class he represented to opt out and

pursue their claims individually and had violated the Court's protective order regarding information produced by Ocwen. *See* dkt. no. 268.

The Seventh Circuit has long recognized that class actions offer fertile soil for conflicts of interest. *See, e.g.*, *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744 (7th Cir. 2008) (describing the paradigmatic conflict). For that reason, the court has repeatedly described a district judge reviewing a proposed settlement as a "fiduciary of the class," responsible for ferreting out inappropriate conduct by class counsel. *See, e.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014). Furthermore, the Court has "an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008); *see also In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 228-35 (D.D.C. 2005); Manual for Complex Litigation § 14.211 (4th ed. 2004).

In light of the allegations against Ankcorn and the Court's own duty to the class, the Court finds it necessary to review the alleged misconduct and, as discussed below, exercise its "broad authority" to address that conduct in the distribution of attorneys' fees. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

**1.    Ankcorn's conduct**

The Court first caught wind of the allegations against Ankcorn in November 2017 when Ocwen filed a motion for leave to depose Ankcorn and for other relief. In its motion, Ocwen contended that Ankcorn had sent letters to members of the plaintiff class who had particularly valuable claims reminding them that they had the right to opt out of the class to pursue individual litigation. That is, knowing that individuals would likely be

compensated at a flat rate if they remained members of the class irrespective how many illegal calls they had received, Ankcorn allegedly persuaded class members who had received large numbers of calls to opt out and to instead pursue their valuable claims individually—presumably to obtain higher recovery. Ocwen also alleged that Ankcorn used the call data produced by Ocwen under protective order during discovery to file a new lawsuit in Florida—the *Graham* suit—on behalf of a number of former members of the *Snyder* plaintiff class. In its motion, Ocwen sought leave to depose Ankcorn and requested a hearing on his conduct.

To understand why Ankcorn's letter-writing campaign and individual representation of class members was potentially fraught, one need only look to paragraph 11.4 of the original settlement agreement. "If 4,000 or more potential members of the Settlement Class properly and timely opt out of the Settlement," that paragraph states, "then the Settlement may be deemed null and void upon notice by Ocwen without penalty or sanction." *See* Final Settlement Agr., dkt. no. 252-1, ¶ 4.2. This sort provision, known as a "blow up" or "tip over" clause, is common in class action settlements and provides a device by which the defendant can terminate the settlement if a certain number (or cumulative value) of claims opt out. *See generally Terms of Art in Class Action Settlements—"Blow Up" Provision*, Newberg on Class Actions § 13:6 (5th ed. 2018). Any effort by class counsel to encourage opt outs could thus endanger the settlement for the class as a whole while (at least potentially) enriching certain individual plaintiffs and their counsel, amounting to a conflict of interest.

In response to Ocwen's motion, Ankcorn denied any wrongdoing. He admitted that he had sent letters to about 2,000 class members, in which he said he asked them

to call or e-mail him in order to help build the record for the motion for a preliminary injunction.  He contended, however, that he had not directly solicited or encouraged opt-outs.  Ankcorn also contended that, although the letters included a reminder of the right to opt out and some recipients indeed asked him about pursuing individual suits, he did not represent such class members himself.  Instead, Ankcorn said, he referred those interested in individual litigation to outside counsel—mostly, the Court later learned, to the law firm of Hyde & Swigert.  He argued that such actions did not constitute an ethical violation.  Likewise, Ankcorn admitted to having filed the *Graham* suits in Florida but attested that the information that he had used to file those suits had been public at the time.  He further contended that he had never earned a fee for that representation and had merely filed the suits as a favor to his colleagues at Hyde & Swigert.

After ordering briefing on Ocwen's motion and holding a hearing on January 4, 2018, the Court denied the motion for leave to depose Ankcorn but ordered him to (1) destroy certain confidential data; (2) inform all parties of the extent of his previous disclosures; and (3) show cause why he should not be removed as class counsel.  After further briefing, the Court removed Ankcorn as lead counsel and appointed Burke Law Offices, LLC and Terrell Marshall Law Group PLLC as interim lead class counsel.  The Court also scheduled an evidentiary hearing on Ankcorn's alleged misconduct for April 5, 2018.

The content and timing of Ankcorn's alleged misconduct came into better focus during his testimony at the April 5 hearing.  According to Ankcorn, he sent about 2,400 letters to members of the *Snyder* class.  These letters apparently included details about the value of individual claims under the TCPA; lauded Ankcorn's firm's skill at

27

prosecuting TCPA claims; and advised class members that they would "need to file an opt out request" in order to keep their individual claims alive. *See* Hearing Tr., dkt. no. 302, at 28:5-7. The letters also included a clause disclaiming that the letters were not intended to be solicitations for representation.

The letters were sent in two rounds. The first round, Ankcorn testified, involved about 2,000 letters sent between September and November 2016 to members of the *Snyder* class who had received between approximately 500 and 1,200 calls from Ocwen. The second round of letters, sent during the spring of 2017, was directed to a subset of 300-400 of those who received letters in the first round. According to Ankcorn, the final such letter was sent in June 2017. The timing of Ankcorn's correspondence with class members is important. The first round of letters was sent between September and November 2016, after the first unsuccessful mediation with Judge Holderman on May 25, 2016 and roughly contemporaneously with the second mediation with Rodney Max on October 14, 2016. The second round of letters was sent to class members in the months preceding the July 20, 2017 mediation with Judge Denlow, which resulted in the original settlement deal. In other words, the record reveals that Ankcorn's letters were sent to members of the class throughout the period during which negotiations to settle the case were ongoing.

During his April 5 testimony, Ankcorn again characterized the letters as entirely innocent. He claimed that when he sent the letters he did not have any reason to expect a successful resolution of the *Snyder* litigation given the failure of the first two mediation sessions. Furthermore, Ankcorn contended that paragraph 11.4's provision for terminating the settlement if 4,000 or more members of the class opted out was not

discussed until the July 2017 mediation with retired Judge Denlow. He again represented that the letters were not intended to solicit individual class members to opt out and pursue profitable litigation. Instead, he contended, the letters were meant to reach credible, knowledgeable class members who could provide evidentiary support for the class's motion for a preliminary injunction. Nevertheless, Ankcorn admitted that virtually all of the class members who responded to his mailings were primarily interested in opting out and pursuing individual claims against Ocwen. But Ankcorn testified that he did not represent any of the class members who reached out to him because he simply did not have the time in the midst of litigating the class action. Rather than offering to personally represent any of the potential opt-outs himself, he said he instead referred them to outside counsel. Specifically, he testified that he referred most of the potential individual claims to the firm of Hyde & Swigert, with which he reported having an "understanding" but from which he says he received no referral fees.

But the April 5 hearing also revealed several pieces of evidence that tend to contradict Ankcorn's characterizations of his conduct. First, Ankcorn's co-counsel pointed out that, by the time the first round of letters was sent in the fall of 2016, there was no investigation remaining to be done on the motion for a preliminary injunction—contrary to his testimony regarding the rationale for the letters. The record supports that position; the motion for a preliminary injunction was filed in October 2016, approximately concurrently with the first round of letters and several months before the second round. Indeed, the motion was fully briefed by February 2017, before the second round of mailings even began. Co-counsel also pointed out that none of the four other firms

29

representing the class were aware that Ankcorn was sending the letters, casting further doubt on his claim that the letters were intended to facilitate fact-finding in the lawsuit.

Second, contrary to Ankcorn's own representations to this Court that he had never represented class members in individual litigation against Ocwen, Ankcorn admitted that he had filed at least one lawsuit in Florida on behalf of a small group of class members with high-value claims. These were the *Graham* cases, discussed above. Ankcorn contends that he acted only as the "filing attorney" as a favor to Hyde & Swigert while that firm sought local counsel. Ankcorn says he did not get paid a fee for his service and only hoped to recover the costs of filing. But the Court notes that Ankcorn nevertheless did appear on behalf of individual class members in that litigation, even if, as he contends, he played only a limited role.

Third, and perhaps most importantly, the Court learned during the April 5 hearing that Ankcorn's firm sent at least one member of the *Snyder* class a retainer agreement for individual representation as an attachment to a second-round letter. Specifically, Ankcorn's co-counsel, Beth Terrell, flagged for the Court that Ankcorn sent class member Earl Simpson a letter dated June 2, 2017, which included a retainer agreement by which Simpson could engage Ankcorn's law firm to represent him in a potential opt-out suit. Unsurprisingly, Simpson—who, the letter stated, had received at least 1,275 calls for which he could receive as much as $1,500 per call if he opted out— obliged by signing the retainer agreement. Earl's son, Pat Simpson, also communicated with one of Ankcorn's employees, Benjamin Charles, about opting out of the plaintiff class. According to Ankcorn's co-counsel Beth Terrell, who spoke with Pat Simpson about the exchange, Charles strongly encouraged Pat to persuade his father to opt out

of the class action and to pursue individual litigation instead.

Ankcorn testified that this was all a big mistake. He sought to offload culpability for the lapse on his employee, Charles. He said that Charles must have "mistakenly" sent the retainer agreement as an attachment to the second-round letter to Earl Simpson. Ankcorn suggested that Charles must have confused Earl Simpson with another client, and he insisted that he had instructed his employees not to give legal advice about opting out of the class. Ankcorn claimed that as soon as he learned about the Simpson retainer—which apparently did not occur until December 2017, five months after the first settlement was reached and two months after the Court conditionally approved it—he instructed Charles to break off the contractual relationship and refer Earl Simpson to Hyde & Swigert. In the meantime, however, while Ankcorn was apparently still retained to represent him, Earl Simpson was added as a plaintiff in the Florida *Graham* litigation—the very same suit that Ankcorn claimed he had filed as a favor to his colleagues at Hyde & Swigert but which he claimed to have stepped away from almost immediately. The Court does not find Ankcorn's explanations regarding this episode to be credible.

### 2. Assessing the damage

At the threshold, the Court finds that Ankcorn had a duty to the putative plaintiff class at all times relevant here. There is no question that class counsel owes a fiduciary duty to a class he or she represents. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002). Courts in this circuit and elsewhere have also found that where, as here, counsel "file[s] a case as a class action," his fiduciary duty extends to the "putative class even before it is certified." *House v. Akorn*, No. 17 C 5018, 2018 WL

4579781, at *2 (N.D. Ill. Sept. 25, 2018), *appeal docketed*, No. 18-3307 (7th Cir.); *see also Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) (holding that named plaintiffs have fiduciary duties to a putative class before certification); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995). Indeed, the Ninth Circuit has noted that the risk of attorneys breaching their fiduciary duty is "even greater" where "a settlement agreement is negotiated prior to formal class certification" and that these potential conflicts must therefore be assiduously policed by reviewing courts. *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 946.

In light of his duty, Ankcorn's conduct is troubling. A careful review of the record reveals a shifting narrative and suspicious timing on Ankcorn's part. Time and again, when confronted with allegations of wrongdoing, Ankcorn has attempted to rationalize his actions in completely innocent terms. The Court is not persuaded. For instance, Ankcorn's assertion that the letters he sent to class members were intended only to serve a factfinding function in support of the motion for preliminary injunction is patently implausible. This is even more emphatically the case for the second-round letters, which all appear to have been sent after briefing on the preliminary injunction was complete. Likewise, Ankcorn's legalistic attempts to distance himself from the *Graham* litigation are unconvincing; his categorical claims that he refused to represent any members of the plaintiff class in individual litigation are, by his own admissions, false. And, as indicated, the Court also finds incredible Ankcorn's explanation that his employee, Charles, went rogue by encouraging a class member responding to a

second-round letter to opt out.

But, Ankcorn was quick to point out, even if he did encourage opt-outs, he did so only before the parties discussed a blow-up clause. He suggested at the April 5 hearing that he therefore had no way of knowing that making referrals could harm the class. Alternatively, he contended that he did not act improperly because he knew there was little risk of enough class members leaving to jeopardize a settlement agreement. He sent 2,000 letters to *Snyder* class members; even if every single recipient had opted out, that would have only gotten the class halfway to the 4,000-opt-out blow-up provision in paragraph 11.4 of the settlement. And, in fact, he reported that only 10-12% of those who he mailed responded. Virtually all of these respondents opted out, but that amounted to only a little over 200 opt-outs. The net effect, he would argue, was fairly negligible.

The Court concludes that Ankcorn's conduct created an unacceptable risk to the plaintiff class's settlement negotiations, for his own gain and in conflict with the class's interests. *Cf. Thorogood*, 547 F.3d at 744 (7th Cir. 2008). Although Ankcorn is correct that the letters he sent to class members preceded specific discussions of the blow-up provision during the July 2017 mediation, the inclusion of such a provision was predictable. Defendants commonly insist on blow-up provisions to insure against costly mass opt-outs. *See Terms of Art in Class Action Settlements—"Blow Up" Provision*, Newberg on Class Actions § 13:6 (5th ed. 2018); Niki Mendoza, *How to Structure Securities Class Action Settlements to Obtain Court Approval and Global Peace*, Am. Bar Ass'n (Aug. 25, 2018) (describing the utility of a blow-up provision). These provisions are no less common in TCPA class actions like this one. *See, e.g.*,

*Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11 C 4462, 2014 WL 4724387, at *6 (N.D. Ill. Sept. 23, 2014) (assessing a TCPA settlement including a blow-up provision). Given the massive potential exposure Ocwen faced if a large number of class members pursued their claims individually, it was no surprise that it insisted on a clause permitting it to terminate the action if too many class members opted out. Ankcorn has stated that he possesses "extensive experience" in cases like this one, having negotiated multiple class action settlements in the past. *See* Ankcorn Decl. in Supp. of Pls.' Mot. for Att'ys' Fees, Ex. 1 to Pls.' Mot. for Att'ys' Fees, dkt. no. 296-1, ¶¶ 2, 4. It is therefore unlikely that Ankcorn was caught off guard by the inclusion of the blow-up provision.

Likewise, although Ankcorn is correct that his letter-writing campaign alone probably could not have triggered paragraph 11.4 as it was eventually written, his attempts to minimize the risk he created are unconvincing. How was he to know *ex ante* that a blow-up threshold would not be set at a lower number or that no one else was attempting to drum up a large enough number of opt-outs from the more than 1.6 million member class to imperil the settlement? There was no way to tell. And, in fact, the Court learned during the April 5 hearing that others *were* soliciting opt-outs from class members. When Reuben Metcalfe appeared and explained that his business represented a sizable number of claimants and opt-outs, it became clear that Ankcorn's was not the only game in town. (The key difference, of course, is that Metcalfe did not owe, much less violate, a fiduciary duty to represent the interests of the class.)

Ankcorn's claim that he did not stand to gain anything from the scheme to siphon valuable claimants to Hyde & Swigert is also unconvincing. Although the Court has no reason to doubt the truth of Ankcorn's assertion that he was not paid a fee, it concludes

that the understanding Ankcorn said he had with Hyde & Swigert likely included implicit promises of future benefit to his own practice.

Finally, the Court finds that the risk created by Ankcorn's conduct was not harmless. Although there were ultimately fewer than 4,000 requests to opt out of the class, the Court has little trouble determining that his conduct risked significantly impairing the plaintiffs' bargaining position during the fourth and final mediation. The plaintiffs were, of course, ultimately able to come away with an objectively more desirable settlement than they had originally been offered. But the plaintiff class may have been able to leverage an even larger settlement amount if the highly valuable class members from whom Ankcorn had solicited opt-outs—which the parties appear to have learned about between the third and fourth mediations—had remained in the class. Crediting Ankcorn's own testimony, the letters he sent resulted in class members whose claims were cumulatively worth tens or even hundreds of millions of dollars opting out of the class.[4] It is not possible to quantify exactly what effect this loss in individual claim value to be discharged by the settlement had on the agreement eventually reached by the parties. But it is clear that by encouraging high-value class members to opt out of the class to pursue individual lawsuits, Ankcorn harmed the class's interests in violation of his fiduciary duty to it.

### 3. Consequences

---

[4] Ankcorn testified that he sent 2,000 letters to members of the class who had received between approximately 500 and 1,200 calls from Ocwen. He further testified that 10-12% of recipients pursued opt-out requests. Taking the lower end of both ranges and multiplying by the statutory damages range, the opt-out claims were potentially worth $150,000,000. If all of the recipients had opted out, which Ankcorn could not have conclusively ruled out at the time he sent the letters, the class would have lost more than $1 billion in potential individual claims with which to bargain.

Based on the record, the April 5 evidentiary hearing and corresponding briefs, and the discussion here, the Court exercises its authority and duty under Rule 23(h) to assess the reasonableness of the fee distribution proposed by the parties. *See Douglas*, 328 F.R.D. at 220-24; *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) ("[T]he district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel."). For the reasons stated below, the Court concludes that the proposed fee distribution must be modified. *See In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 228-35 (D.D.C. 2005) (exercising this authority to modify fee distribution)

As noted, the amended settlement seeks $4,789,250 in attorneys' fees—$500,000 less than the original settlement. The Court already expressed its opinion that this amount appears fair and reasonable. According to their submissions to this Court, the five firms representing the plaintiffs have agreed to the following distribution of the fees: (1) 75% split among the Terrell Marshall Law Group PLLC, Ankcorn Law Firm, PC, and the Cabrera Firm, APC; and (2) the remaining 25% split between Burke Law Offices, LLC and Heaney Law Offices, LLC. It is unclear from the parties' submissions precisely how the distribution to each individual firm will be calculated, but the plaintiffs' statement of lodestar hours may offer some clues. That statement suggests that the value of services provided by each firm are distributed as follows: Terrell Marshall (about 31%); Burke (about 31%); Ankcorn (about 23%); Cabrera (about 10.5%); and Heaney (about 4%). If one applies these same percentages to the reduced settlement amount, Ankcorn may be awarded well over $1,000,000 in fees if distribution is left to

36

the parties.

Given Ankcorn's actions, the Court concludes that it is appropriate to reduce his fee. The Seventh Circuit has held that district courts "must set a fee by approximating the terms that would have been agreed to ex ante, had negotiations occurred." *Americana Art China Co.*, 743 F.3d at 246-47. Any such approximation must account for Ankcorn's conduct. Specifically, by encouraging members of the plaintiff class with valuable claims to abandon the class, Ankcorn put settlement at risk in clear conflict with the interests of the class as a whole. But the Court must also acknowledge the good result that plaintiffs' counsel collectively obtained for the class; the amended settlement includes a $21,500,000 fund, the lion's share of which is to be distributed to class members. Balancing these considerations, the Court concludes that the Ankcorn Law Firm is entitled to no more than the value of its services—$601,697.50, according to the plaintiffs' lodestar hours statement—and not to any risk multiplier.

Ankcorn has lost any claim to a risk multiplier by creating unnecessary and unacceptable risk. Risk multipliers are intended to compensate attorneys for the risk of nonpayment inherent in contingency fee cases. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 732 (1987) (O'Connor, J., concurring); *In re Synthroid Mktg. Litig.*, 264 F.3d at 718-19. Here, plaintiffs' counsel faced significant risk of nonpayment after the first two unsuccessful mediations. But, rather than working to reduce this risk by facilitating resolution of the class's claims, Ankcorn's conduct actively and materially increased it by siphoning away valuable claims, thereby weakening the plaintiff class's bargaining position in subsequent negotiations. Likewise, Ankcorn's actions drove up the number of opt-outs, increasing the probability of

triggering a blow-up provision like the one that was later added—and which, as discussed above, Ankcorn should have anticipated likely would be included in any eventual settlement.

Because Ankcorn's conduct increased the risk of nonpayment for him and for his co-counsel, the Court will limit the Ankcorn Law Firm to the $601,697.50 that Ankcorn represented the firm's services to be worth in the April 2018 statement of lodestar hours. This resolution compensates Ankcorn fairly for his contributions to the favorable outcome in the case while simultaneously holding him to account for the unacceptable risk that he created for his clients and colleagues. The value of any additional fee to which Ankcorn may otherwise have been entitled—whether by way of a risk multiplier, by agreement among his group of class counsel, or otherwise—shall return to the fund from which claims are paid and shall be distributed proportionally to claimants. *See NBTY, Inc.*, 772 F.3d at 786 ("The simple and obvious way for the judge to correct an excessive attorney's fee for a class action lawyer is to increase the share of the settlement received by the class, at the expense of class counsel.").

This modification of attorneys' fees is not intended to affect the other attorneys who jointly represented the class. The total fee award is reduced only by the difference between the amount that the Ankcorn Law Firm would have received had the appropriate multiplier been applied to its portion of the award and the firm's lodestar amount of $601,697.50. The Court leaves it to class counsel to calculate that figure precisely. Terrell Marshall, Burke, Cabrera, and Heaney remain free to distribute the remaining attorneys' fees according to their own internal agreement or in any other reasonable manner—so long as that distribution does not allocate Ankcorn more than

38

the amount awarded by the Court in this order.

## Conclusion

For the foregoing reasons, the motion for final approval of the amended settlement is granted subject to the modifications described here, while the motion for attorneys' fees is granted in part. The Court modifies the settlement such that the distribution of the $21,500,000 common fund is as follows: (1) $1,600,000 to Epiq for the costs of notice and administration; (2) $96,380 to plaintiffs' counsel for costs; (3) $4,789,250 to plaintiffs' counsel for fees, less any amount greater than $601,697.50 that the Ankcorn Law Firm would have received by way of a risk multiplier, agreement among counsel, or otherwise; (4) $30,000 to named plaintiffs Keith Snyder, Susan Mansanarez, and Tracee Beecroft as incentive awards; and (5) the remainder to compensate claimants as set forth herein.

The Court also orders class counsel to submit, by May 21, 2019, a status report detailing (1) the precise amount that the Ankcorn Law Firm would be receiving but for the Court's order (which per this order must be reallocated to the fund from which claimants are compensated) and (2) how class counsel intend to allocate the remaining attorneys' fees award. Counsel are also to submit by that date a draft judgment and order embodying the Court's rulings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 14, 2019